**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------

| | |
|---|---|
| John H. Scher, | : |
| | : |
| Plaintiff, | :          Civ. No. 05-3177 (DRD) |
| | : |
| v. | : |
| | : |
| Slater Entertainment, LLC, et. al, | :          **O P I N I O N** |
| | : |
| Defendant. | : |
| | : |

-------------------------------------------------------

John P. Lacey, Esq.
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068

*Attorney for Plaintiff*


Michael K. Furey, Esq.
RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981

*Attorney for Defendant*

1

**DEBEVOISE, Senior District Judge**

## I. PROCEDURAL HISTORY

On December 16, 2004, Plaintiff, John Scher, filed a complaint against Defendant, Slater Entertainment LLC (and several other defendants no longer parties to this suit) stating a cause of action for fraudulent conveyance.  That complaint includes the following five counts: Count 1 – fraudulent transfer in violation of the New York Debtor and Creditor Law § 273; Count 2 – fraudulent transfer in violation of the New York Debtor and Creditor Law § 274; Count 3 – fraudulent transfer in violation of the New York Debtor and Creditor Law § 275; Count 4 – fraudulent transfer in violation of the New Jersey Uniform Fraudulent Conveyance Act, N.J.S.A § 25:2-20 to 34; Count 5 – fraudulent transfer in violation of 11 U.S.C. § 548.

Thereafter, Slater Entertainment removed the action to this court.  On August 12, 2005 Slater Entertainment filed a motion to dismiss for failure to state a claim.  That motion was denied.  On November 2, 2005 Slater Entertainment filed a motion for summary judgment.  Then, on December 12, 2005, Scher moved to disqualify Slater Entertainment's counsel, Riker, Danzig, Scherer, Hyland, and Perretti, LLP ("Riker Danzig").  For the reasons set forth below, Scher's motion to disqualify will be denied and Slater Entertainment's motion for summary judgment will be granted.

## II. BACKGROUND

Much of the background to this case is thoroughly discussed in this court's opinion in Scher v. New York Metro Concerts, LLC, No. 03-0423, slip op. (D.N.J. June 9, 2003).  From that opinion, the following findings are relevant to the case at hand:

Scher was for many years a successful promoter of concert and concert tours in the New York Metropolitan area.  In recent years, he conducted his business through Metropolitan Entertainment Co., Inc.  ("MEC") of which he was President and owner of 40 percent of its shares.

MEC's ultimate parent was Covanta Energy Corporation ("Covanta") a publicly traded company.

Clear Channel is the world's leading producer of live entertainment events, a division of a Fortune 500 New York Stock Exchange listed company.

Mitchell Slater ("Slater") was at the time relevant to this case in the entertainment business.  He formed a company to acquire the assets of MEC named Slater Entertainment, LLC ("Slater Entertainment").

At one time a valuable asset of MEC was a concessionaire agreement ("The Montage Lease") between MEC and Lackawanna County Performing Arts Center Authority, ("the Authority").

Under the Montage Lease, MEC had the exclusive concession for conducting events at the Montage Mountain Amphitheater owned by the Authority.  The lease was valued at somewhere between $2 million and $3 million.

In early 2001, Clear Channel developed an interest in acquiring MEC.  On March 9, 2001 Clear Channel entered into a confidentiality agreement with MEC, ("Confidentiality Agreement") [The agreement was intended to allow Clear Channel access to confidential information it needed to evaluate MEC prior to acquisition but specified that the information could not be used for any other purpose.]  Scher signed the confidentiality agreement on behalf of MEC.

. . . .

Clear Channel held discussions with Scher and on June 13, 2001 sent a letter to MEC in which Clear Channel offered to purchase the assets of MEC's concert and touring divisions for the sum of $17 million.

MEC did not respond.  Thereupon, certain MEC principals sued in state court concerning the sale of MEC's assets at that price or a greater price.

The parties settled on August 10, 2001.  Scher agreed to step down as MEC's President, to reduce his salary and to transfer all but 13.5 percent of MEC's outstanding stock.  He expected to receive 13.5 percent of the MEC sale price, which he estimated at that time to be approximately 13.5 percent of the $17 million.

As part of the settlement, Scher agreed to [a] three-year restrictive covenant . . . .  This agreement, of course, would protect a purchaser [of] MEC from the formidable competition Scher was in a position to provide.  The principals of MEC other than Scher proceeded with efforts to sell MEC. Although Clear Channel continued its efforts to effect the purchase, the MEC principals elected also to negotiate with Slater.  Clear Channel, nevertheless, continued to inspect MEC's venues and as a result of what it found proposed in January 2002 to MEC principals that reduction in the originally offered purchase price be negotiated.

The terms were renegotiated and as of January 23rd Clear Channel was offering approximately $10 million for MEC's assets.  It developed at the hearing on the application that MEC would have preferred to accept Clear Channel's proposal but could not do so because of MEC's precarious financial situation and the fact that a closing would be delayed by a Justice Department antitrust investigation of Clear Channel.

On January 25, 2002, Scher instituted an action in the New Jersey Superior Court against MEC and others [including Covanta] challenging the validity of the Non-Competition agreement on the ground of its unreasonableness and on the ground [] that [] defendant had violated the terms of the settlement of which the Non-Competition agreement was a part.

While this suit was pending, negotiations between MEC and Slater continued.  Prior to February 8, 2002, the Authority contacted Clear Channel concerning the Montage lease.

On February 8 Clear Channel learned that MEC intended to enter into a sale agreement with Slater or his corporate designee.

4

Upon receipt of that information, Clear Channel immediately advised the Authority that it was available to discuss the concession with the Authority.

On February 14, 2002, the Authority's counsel wrote to Clear Channel stating that the Authority had authorized him to request from Clear Channel a proposal for a lease of the Montage Amphitheater.

On the same day, Clear Channel responded, setting forth the strength of its position as a producer and marketer of live entertainment and submitting a detailed proposal for relief.  After the negotiations, Clear Channel sent a revised proposal to the Solicitor for the Authority.  On February 19 and on February 27, 2002, a marked-up formal agreement was circulated.

On February 12 to 19 2002, Clear Channel sent letters to the members of the Board of Directors of Covanta and MEC advising them of the asserted superior offer it was willing to make for MEC's assets and comparing it with the terms Slater was offering.

On or about February 26, 2002 MEC agreed to sell MEC's assets to Slater for $6 million.  MEC would obtain ten percent of the stock of Slater's new company, Slater Entertainment.

Another MEC executive, Keith Beccia, would get 20 percent of the new company.  Thus, Slater's payment of $6 million in cash for MEC was for a 70 percent interest in the new company, giving the transaction a total cash value of $8,750,000.

Scher asserts that the deal was really worth substantially more because Slater Entertainment assumed $2 million of MEC debt.  The Non-Competition agreement was not included.

Events that immediately followed execution of the Slater sale agreement disrupted the transaction as described above.  Clear Channel and the Authority had been negotiating a lease of the Montage Amphitheater with Clear Channel offering terms much more favorable to the Authority than those of the lease with MEC.

On February 28, 2002, the Authority's Commissioners met.  They voted to

withhold consent to the assignment of the concession agreement from MEC to Slater's newly formed company; giving as a reason the thin capitalization of the new company and the absence of a substantial parent company or individual guarantor to make up any losses.

The Commissioners voted to declare a default under and terminate the lease with MEC, citing the impending bankruptcy of MEC's parent, Covanta, and MEC's default under various of the financial requirements of the Montage lease.

Finally, the Commission authorized its solicitor and Board member to negotiate a new lease agreement with another party, steps which already had begun.

On March 4, 2002, the Authority wrote to MEC informing it that it was declaring a default under the lease and terminating it on account of MEC's financial condition.

MEC promptly filed a suit in Pennsylvania State court for declaratory and injunctive relief.  Apparently for lack of resources, [MEC] has failed to pursue the action.

Having lost one of its principal assets, MEC, of necessity, had to renegotiate the sale with Slater.  A new agreement reduced the sale price from $6 million to $3.5 million.  Neither MEC nor Beccia received an interest in Slater's new company, but included in the consideration was a warrant permitting MEC to purchase a ten percent interest in Slater's new company, Slater Entertainment.

. . . .

On March 15, 2002, MEC's Board of Directors met.  Scher's attorney and his accountant attended.  The second Slater agreement contained broad terms as to the sale of MEC's business, assets and good will.

In addition to the generality of the sale terms was the detailed listing of the included assets.  A Schedule 2.2 listed 17 excluded assets, including the Montage lease.

The excluded assets, as well as other provisions, were discussed at the meeting.  Scher did not object to the items to be sold, or to what was ultimately excluded.  He did object to the sale to Slater rather than to Clear Channel.

The closing of the sale of MEC's assets to Slater Entertainment took place on the afternoon of March 15 . . . .  The monthly payments of $20,833.33 to Scher commenced.

. . . .

Meanwhile, Scher's suit in state court to invalidate the Non-Competition agreement continued.  Scher filed a certification in that action dated April 5, 2002 referring to the March 15, 2002 MEC Board meeting which he had attended.

He stated, "For the first time I learned that defendants were now proposing to sell substantially all of MEC's assets to Slater for just $3.5 million rather than $6 million, as it did originally.

. . . .

On December 6, 2002, an Asset Purchase Agreement was entered into between Slater Entertainment, as seller, Slater as the controlling person, and the Clear Channel entity, New York Metro Concerts, LLC, ("Metro") as buyer . . . ."

Slater Entertainment sold its assets with certain exceptions to Clear Channel for $9.85 million, plus or minus adjustments, and for the assumption by Metro of certain liabilities.

Id. at 59:20-71:5.

On December 16, 2002 MEC filed a voluntary petition for relief under Chapter 11 of the

United States Bankruptcy Code.  The proceedings that followed were administratively

consolidated with a previously filed bankruptcy petition involving Covanta.  On January 26,

2004 the debtors filed their Second Amended Joint Plan of Reorganization and Second Amended

Joint Plan of Liquidation.  On March 5, 2004 the United States Bankruptcy Court for the Southern District of New York confirmed both plans.  Upon confirmation, MEC's rights of actions, including its avoidance actions, were transferred to Covanta under the Reorganization Plan.

On September 10, 2004, Covanta filed a Notice of Motion for Final Decree closing certain of its Chapter 11 cases.  Scher filed a Limited Objection to the closing of those cases.  On September 23, 2004 the Bankruptcy Court entered the Final Decree.  Scher withdrew his objection on October 13, 2004.

In the meantime, Scher's January 25, 2002 state court action against MEC and Covanta challenging the August 10, 2001 settlement agreement had been transferred to the bankruptcy court.  On February 11, 2005 the parties settled that action under which Scher received $345,000 as well as

> . . . all assets in the form of claims, causes of action, rights, title and interests (whether contractual, leasehold, beneficial or legal) [MEC and Covanta] may have . . . in connection with Slater Entertainment LLC's and Mitchell Slater's purchase and sale of assets originally belonging to one or more of the Corporate Defendants [MEC and Covanta].

MEC and Covanta expressly disclaimed any warranty associated with the above assignment.

The agreement was signed on or about February 11, 2005.  However, prior to that date, on December 16, 2004, Scher filed the present action alleging that MEC harmed its creditors and shareholders, including Scher, by fraudulently conveying its assets to Slater Entertainment. Scher did not serve the Complaint in this action on Slater Entertainment.  The latter first learned of it upon receiving Scher's notice of motion to file an amended complaint in June of 2005.

With regard to Scher's motion to disqualify Riker Danzig as counsel, the following facts are pertinent: In July of 2001 two directors from MEC and Ogden sued Scher to appoint a provisional director to the MEC Board of Directors.  Riker Danzig, Slater Entertainment's counsel in this matter, represented the directors.  On August 10, 2001 the parties settled.  That settlement included the aforementioned non-compete agreement.

In January of 2002 Scher sued MEC, Covanta and several individual defendants in state court, seeking to void the non-compete agreement.  Riker Danzig represented the defendants in that matter.

On March 15, 2002 MEC sold its business, assets, and good will to Slater Entertainment. Riker Danzig did not represent either party in the asset sale nor did it engage in the negotiation of that sale.  However, it did advise MEC's attorneys regarding questions of New Jersey corporate governance law and its attorneys attended two meetings for the MEC Board of Directors at which the Board approved the sale, but the attorneys served only to answer questions regarding New Jersey law.

After the asset sale was completed Slater Entertainment intervened and assumed MEC's defenses in Scher's ongoing state court action to void the non-compete agreement.  Riker Danzig represented Slater Entertainment in that action.  The state court entered an order denying Scher's application to have the non-competition agreement declared unenforceable.

On or about April 1, 2002, Ogden and Covanta and various affiliated entities filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.  On December 12, 2002, MEC commenced a voluntary Chapter 11 bankruptcy proceeding.  The

Bankruptcy Court consolidated the two cases.  The state court action was removed to the federal court, and the claims were transferred to the Bankruptcy Court for the Southern District of New York as an adversary proceeding.

On or about August 1, 2003 Scher filed an amended complaint against MEC, Covanta and several individual defendants in the adversary proceeding.  Riker Danzig represented the defendants in that proceeding, filing an answer and motions to dismiss and for summary judgment, none of which were decided prior to the settlement of the adversary proceeding at which it was dismissed.

During the negotiation of the settlement the law firm of Jenner & Block represented Covanta and the individual defendants.  The law firm of Wollmuth, Maher & Deutsch represented James N. Lawlor, the liquidating trustee of MEC.  Riker Danzig had been representing MEC, but when it became aware at the beginning of the negotiations that the settlement might affect Slater Entertainment it informed defendants' in-house and bankruptcy counsel that it could not be involved any further because the law firm represented Slater Entertainment and Slater in another matter.  Riker Danzig withdrew from further representation and discussions relating to the settlement.  It was apparent that the interested parties, defendants, including MEC and Covanta, and Slater Entertainment were fully aware of Riker Danzig's attorney relationships and had no objection to them.

### III.  DISCUSSION

#### A.  Plaintiff's motion to disqualify Riker Danzig

"The Rules of Professional Conduct of the American Bar Association as revised by the

New Jersey Supreme Court . . .  govern the conduct of the members of the bar admitted to practice in this Court."  Loc. R. 103.1.

In construing the Rules of Professional Conduct ("RPC"), a district court is bound by the interpretations the New Jersey Supreme Court has given them.  Id., cmt.  Only "[w]here there is no definitive state court decision interpreting the rules . . . [will] the federal Court . . . proceed to reach its own conclusion as to the appropriate application of the Rules of Professional Conduct."  United States v. Balter, 91 F.3d 427, 435 (3d Cir. 1996).

Under New Jersey law, the party who brings a disqualification motion based on an attorney's successive representations bears the burden of proving that disqualification is appropriate.  Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 222 (N.J. 1988).

> A party seeking disqualification must meet a "heavy burden" of proof before a court will disqualify an attorney or law firm.  In light of this high standard, New Jersey courts engage in a "painstaking analysis of the facts" when addressing motions for disqualification.  Throughout this analysis, this Court recognizes that although a party has no right to specific counsel, the selection of counsel by a party is "entitled to substantial deference."

Rohm & Haas Co. v. Am. Cyanamid Co., 187 F. Supp. 2d 221, 226-227 (D.N.J. 2001).

**Rule of Professional Conduct 1.9(a)**

Scher contends that Riker Danzig must be disqualified pursuant to RPC 1.9(a).  That Rule provides:

> A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing.

It is "a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him."  In re Corn Derivatives Antitrust Litigation (MDL 414),

748 F.2d 157, 162 (3d Cir. 1984).  Several justifications support the rule.

> Without such a rule, clients may be reluctant to confide completely in their attorneys.  Second, the rule is important for the maintenance of public confidence in the integrity of the bar . . . .  Finally, and importantly, a client has a right to expect the loyalty of his attorney in the matter for which he is retained.

Id.

Thus, if there is any doubt as to the propriety of an attorney's representation of a client, "such doubt must be resolved in favor of disqualification." Reardon v. Marlayne, Inc., 83 N.J. 460, 471 (N.J. 1980); Herbert v. Haytaian, 292 N.J. Super. 426, 438-39 (App. Div. 1996).

 If the court concludes that disqualification is required under RPC 1.9, "it must then weigh that conclusion against the affected client's right to counsel of his or her choice." Dewey, 109 N.J. at 222.  "[O]nly in the most unusual case," however, "will the client's right prevail" over the concerns that animate the RPCs. Id. at 221-2 ("only in extraordinary cases should a client's right to counsel of his or her choice outweigh the need to maintain the highest standards of the profession")

Under RPC 1.9(a), three prongs must be satisfied to warrant an attorney's or a firm's disqualification.  First, the lawyer must have represented the former client at some previous time.  Second, the lawyer's current representation must occur in the same or a substantially related matter.[1]  Finally, the current client's interests must be materially adverse to those of the former client. Home Care Industries, 154 F. Supp. 2d 861, 866 (D.N.J. 2001); Host Marriott

---

[1]"[T]he meaning of 'substantially related' under RPC [1.9(a)] is broadly construed in New Jersey." Kaselaan & D'Angelo Associates, Inc. v. D'Angelo, 144 F.R.D. 235, 241 (D.N.J. 1992).  A substantial relationship between matters exists where "the adversity between the interests of the attorney's former and present clients has created a climate for the disclosure of relevant confidential information." Reardon, 83 N.J. at 472.

Corporation v. Fast Food Operators, Inc., 891 F. Supp. 1002, 1007 (D.N.J. 1995); Kaselaan &

D'Angelo Associates, Inc. v. D'Angelo, 144 F.R.D. 235, 238 (D.N.J. 1992).

With regard to the first prong, Scher argues that he should be considered Riker Danzig's

former client because, he contends, MEC assigned to him the right to the present cause of action

in the February 11, 2005 settlement agreement.  Thus, Scher argues, he stepped into the shoes of

MEC.

There is no question that MEC would be considered a former client.  As discussed above,

Riker Danzig represented MEC on several occasions.  First, it represented MEC when the latter

filed suit against Scher in July of 2001.  That case ended in a settlement that included the non-

compete agreement.  Next, Riker Danzig represented MEC when Scher filed suit against MEC in

January of 2002 seeking to void the non-compete agreement.  That case is referred to as the State

Court Action.  In March of 2002, MEC consummated the asset sale that is the subject of the

present litigation.  The law firm of Kilpatrick Stockton represented MEC in that sale.  Riker

Danzig did not represent MEC in that sale nor did it engage in any negotiations relating to the

sale but it did provide Kilpatrick Stockton with explanations of New Jersey law to aid it in its

representation of MEC.  Finally, Riker Danzig represented MEC in the adversary proceeding that

arose when the State Court Action was transferred to bankruptcy court (although Riker Danzig

ultimately withdrew from that representation).

Nevertheless, MEC's status as a former client does not necessarily transfer to Scher

simply because Scher acquired whatever claims MEC had against Slater Entertainment with

regard to the asset sale.

Scher cites several cases for the proposition that "[o]ne who succeeds to the liabilities and

rights of a former client may too be considered a former client for purposes of a disqualification motion.  (Pl.'s Br. in Supp. of Disq. Mot. at 9).  But each of the cases Scher cites to support his proposition is distinguishable from the present case in that it relates to situations where an individual or entity takes control or management of another entity.  For example, Scher cites Oswell v. Tekni-Plex, Inc., 299 N.J. Super. 658 (App. Div. 1997), which held that a corporation, upon taking over management and control of another corporation, is considered a former client of any firm that represented the prior company.  The court held that "[w]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well."  Id. at 669 (internal quotations omitted).  Such a rule is intended to maintain protection for the client corporation even when management changes hands. It is not intended to bestow the benefits of the attorney-client privilege upon a party who merely acquired a claim from another entity, without succeeding to management and control of that entity, and is not asserting the claim on that entity's behalf.

 Scher also cites In re Jaeger, 213 B.R. 578 (Bankr. D. Cal. 1997).  In that case, the court held that "the duty of loyalty ow[ed] by an attorney to a former client who is now a chapter 7 debtor extends to the chapter 7 trustee, where the debtor is a corporation."  Id. at 582.  Like the new managers in Oswell, the chapter 7 trustee in Jaeger had assumed responsibility for the corporation and asserted the attorney-client privilege on the corporation's behalf.

The other cases Scher cites similarly recognize that the attorney-client privilege passes to those who assume control of an entity.  Moreover, in New Jersey, "[i]n the corporate setting, it is clear that the corporate attorney-client privilege can only be claimed by those who currently control the corporation . . . ."  In re the Estate of Fedor, 356 N.J. Super. 218, 220 (Ch. Div.

2001).

In the present case, Scher has not assumed control of MEC and he is not asserting the attorney-client privilege in order to protect MEC. Rather, he merely acquired a right to whatever claims MEC had against Slater Entertainment with regard to the asset sale. Therefore, Scher does not qualify as a former client and disqualification is not warranted under RPC 1.9(a).

## Scher's contention that Riker Danzig acquired confidential information

Scher contends that Riker Danzig should be disqualified because, in its prior representations of MEC, it acquired confidential information about the asset sale. But Scher fails to explain why the acquisition of such information would necessarily warrant disqualification. Confidentiality only exists in a privileged relationship, such as between an attorney and client. As Riker Danzig and Scher never engaged in an attorney-client relationship, Riker Danzig owes no duty to Scher and Scher has no attorney-client privilege with Riker Danzig.

Scher fails to cite any RPC or case law that requires disqualification where a non-client party might be harmed in litigation because the opposing party's attorney acquired relevant information from a former client. Therefore, even if Riker Danzig acquired information from MEC that may help in its representation of Slater, such circumstances do not warrant Riker Danzig's disqualification.

## Public Policy - the appearance of impropriety

Rule 1.9(a) is "a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him." In re Corn Derivatives Antitrust Litigation, 748 F.2d 157, 162 (3d Cir. 1984). Several justifications support the rule.

> Without such a rule, clients may be reluctant to confide completely in their attorneys. Second, the rule is important for the maintenance of public confidence

15

in the integrity of the bar . . . .  Finally, and importantly, a client has a right to expect the loyalty of his attorney in the matter for which he is retained.

Id.

Scher argues that Riker Danzig's representation of Slater Entertainment is at odds with the policies underlying the RPCs as it presents an appearance of impropriety.  Although an appearance of impropriety does not automatically preclude representation, a court may consider it in determining whether an attorney should be disqualified.  State v. Davis, 366 N.J. Super. 30, 44 (App. Div. 2004).  Scher argues that there is an appearance of impropriety because Riker Danzig represented MEC in the proceedings that led to the settlement in which MEC assigned to Scher whatever claims it had against Slater, and now, Riker Danzig represents Slater in its defense against the same claims.

But despite those circumstances it is clear that Riker Danzig has never represented Scher and has not acted in any fiduciary capacity on Scher's behalf.  On the contrary, Riker Danzig has been at odds with Scher in each of the proceedings leading up to the present litigation, including its prior representations of MEC and Slater Entertainment.  Thus, Scher could not have expected any loyalty or confidentiality from Riker Danzig.

Moreover, there is no appearance that any duty of loyalty or confidentiality has been breached.  As such, the public's confidence in the integrity of the bar will not be compromised by Riker Danzig's representation against Scher.  Therefore, Riker Danzig's representation of Slater Entertainment is not at odds with any of the policies underlying the RPCs, including the alleged appearance of impropriety.  For the reasons stated above, Scher's motion to disqualify Riker Danzig will be denied.

**B.  Slater Entertainment's motion for summary judgment**

Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.   In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson, 477 U.S. at 255).  But where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (U.S. 1986).

In order to understand the contentions of the parties with regard to the merits of Scher's claim against Slater Entertainment, it is necessary to summarize the events that led to Scher's acquisition of this claim.

The August 10, 2001 settlement of the 2001 lawsuit provided, among other things, that Scher would retain 13.5 percent of MEC's stock, thus entitling him to 13.5 percent of the net proceeds of the contemplated sale of MEC.  There followed the jockeying for MEC's assets between Slater Entertainment and Clear Channel, complicated by Clear Channel's maneuvering

17

to obtain the valuable Montage lease that MEC had held.  As a consequence of the loss of the lease, MEC renegotiated the terms of the sale of its assets to Slater Entertainment, reducing the price on March 15, 2002 to $3.5 million.  On December 6, 2002 Slater Entertainment turned around and sold most of its assets to Clear Channel for $9.85 million, plus or minus adjustments, and for the assumption by a Clear Channel affiliate of certain liabilities.  It is the March 15, 2002 MEC sale to Slater Entertainment for $3.5 million that Scher challenges as a fraudulent transfer.

In April and December 2002 the bankruptcy proceedings previously referred to were filed and consolidated.  In December 2003 or January 2004 Covanta and MEC filed with the Bankruptcy Court i) Covanta's Second Joint Plan of Reorganization under Chapter 11, ii) its Second Joint Plan of Liquidation under Chapter 11 and the Second Disclosure Statement. Although MEC and the other Covanta entities filed for reorganization under Chapter 11, their plans contemplated liquidation.

The Plan of Liquidation appointed a Liquidating Trustee to oversee the liquidation of the assets.  Section 6.9 of the Plan, entitled "Reservation of Rights of the Estate," provided in pertinent part:

> As to each Liquidating Debtor, all claims, causes of actions, cross claims and counterclaims of such Liquidating Debtor of any kind or nature whatsoever against third-parties arising before the Confirmation Date shall be preserved for the benefit of the Liquidating trust, **except for . . . (ii) such claims or causes of action, cross-claims and counterclaims of the Liquidating Debtors that have been transferred to Reorganized Covanta pursuant to the Secured Creditor Direction and the DIP Lender Direction.**

"DIP Lender Direction" is defined in the Plan of Liquidation as "the direction of the DIP Lenders, instructing the Liquidating Debtors to transfer any Designated DIP Collateral to Reorganized Covanta."  "Designated DIP Collateral" includes "any Causes of Action of the

Liquidating Debtors."  "Causes of Action" is broadly defined as "all claims and causes of action now owned or hereafter acquired by such Liquidating Debtor, whether arising under any section of the Bankruptcy Code or other federal or state law, including, without limitation, causes of action for preferences, fraudulent conveyances, and other avoidance power claims . . . ." Accordingly, all causes of action belonging to MEC and the other Liquidating Debtors were transferred to and revested in the reorganized debtor entities upon confirmation of the Plans.

By Orders dated March 5, 2004, the United States Bankruptcy Court for the Southern District of New York confirmed both the Plan of Liquidation and the Plan of Reorganization and on March 12, 2004 appointed a liquidating trustee.

In the winter of 2004 the parties to the adversary proceeding engaged in negotiations and agreed in principle to a settlement, which included an assignment of MEC's interest in its fraudulent conveyance claim against Slater Entertainment arising out of the March 15, 2002 MEC sale to Slater Entertainment.

On September 10, 2004, Covanta filed with the Bankruptcy Court a notice of motion for final decree closing certain of its Chapter 11 cases.  Scher filed a limited objection.  On September 23, 2004, the Bankruptcy Court entered a final decree, and on October 13, 2004, Scher withdrew his objection.

Prior to the settlement and dismissal of the adversary proceeding, the negotiation of which is referred to above, on December 16, 2004 Scher filed the present action in the New Jersey Superior Court.  He did not serve or send a copy of the complaint to Slater Entertainment, but continued to negotiate a settlement of the adversary proceeding.  On February 11, 2005 Scher entered into a settlement agreement and mutual release (the "2005 Settlement Agreement") with

Covanta and MEC which resolved his adversary proceeding.  That proceeding had originated in New Jersey Superior Court and asserted the claims as a part of his January 25, 2002 suit to invalidate the non-competition agreement.

Pursuant to the settlement, Scher, Covanta and MEC exchanged a mutual release of all claims arising out of or relating to the disputes between them and the adversary proceeding. Scher received $345,000 and other consideration in settlement of his claims.  Additionally, Covanta and MEC transferred to Scher:

> all assets in the form of claims, causes of action, rights, title and interests (whether contractual, leasehold, beneficial or legal) they may have . . . in connection with Slater Entertainment LLC's and Mitchell Slater's purchase and sale of assets originally belonging to one or more of the Corporate Defendants.

Covanta and MEC expressly disclaimed any warranty concerning this assignment or the validity of the underlying claims:

> The Defendants provide no warranties or assurance concerning (a) the transferability or assignability of the assets, rights and claims contemplated to be assigned or transferred pursuant to Exhibits A and B hereto, or (b) the existence or validity of any claims referred to therein.  No defendant shall have any liability for breach of this Agreement in the event that any of the assignments or transfers contemplated in Exhibits A and B hereto are not or fail to become effective.

On February 15, 2005, Scher signed a Stipulation of Dismissal with prejudice of the adversary proceeding, which was then ordered by the Bankruptcy Court.  Concomitantly, he withdrew his proof of claim.

Slater Entertainment became aware of the instant action in June, 2005, when Scher moved to file an amended complaint and served Slater Entertainment's registered agent.  Slater Entertainment removed the action to this court.  As noted previously, Scher seeks relief under the New York Debtor and Creditor Law, 10 N.Y. Dr. & Cr. §§ 273-276, the New Jersey Fraudulent

Transfer Act, N.J.S.A. § 25:2-20 to 34, and Section 548 of the Bankruptcy Code, 11 U.S.C. § 548.

## Count 5 – fraudulent transfer in violation of 11 U.S.C. § 548

Slater Entertainment argues that Count 5 should be dismissed because Scher lacked standing to assert such a claim when he filed his complaint on December 16, 2004, and because that claim was time-barred when it was finally assigned to Scher on February 11, 2005.

Under 11 U.S.C. § 546(a),

An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of –

> (1) the later of –
>    (A) 2 years after the entry of the order for relief; or
>    (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
> (2) the time the case is closed or dismissed.

MEC filed its bankruptcy petition on December 16, 2002.  Consequently § 546(a)(1)(A) would bar a § 548 proceeding on account of a fraudulent transfer unless it were commenced by December 16, 2004.  Scher, contending that he stands in the shoes of MEC, asserts that his § 548 claim is not barred for two reasons.  First, he asserts that filing the instant action on December 16, 2004, was within the two year period, and that the February 11, 2005 settlement agreement related back to the December 16, 2004 filing of the complaint.  Second, he contends that Slater Entertainment is applying the wrong limitations period.  The proper period, he contends, is not two years from December 16, 2002; rather the proper period is found under § 546(a)(1)(B), namely, one year after the March 12, 2004, appointment of the liquidating trustee.  Both the commencement of the action and the February 11, 2005 transfer of the fraudulent transfer to

Scher were well within that period.

However, § 546(a)(1)(B) does not apply to debtor-elected trustees that are appointed pursuant to a plan of liquidation in Chapter 11 cases.  Rather, § 546(a)(1)(B) applies where the trustee was: elected by creditors in cases filed under Chapters 7 and 11; appointed in a railroad reorganization case pursuant to § 1163; or appointed in cases filed under Chapters 12 and 13. Therefore, the present case is governed by the two-year limitations period described in § 546(a)(1)(A).  As such, Count 5 is time-barred unless Scher had standing to bring that claim when he filed his complaint on December 16, 2004.

Scher argues that he acquired standing to assert this claim in the February 11, 2005 assignment from MEC and Covanta of any and all claims those parties had against Slater Entertainment, and that such standing should relate back to the date he filed suit.

Scher cites Ciba-Geigy Corp. v. Alza Corp., 804 F. Supp. 614 (D.N.J. 1992).  In that case the court held that "where a licensor assigned its interest in [a] patent [to a licensee] a few weeks after the licensee commenced suit, the licensee had standing to bring the action even though [the licensee did not have standing] when [it] instituted the lawsuit . . . ."  Id. at 636.  But in that case, the limitations period had not expired when the licensee obtained the rights to the claim.  In fact, the court noted the impracticality of dismissing the licensee's claim for lack of standing.  As the court stated, "due to the rights in the patent that [the licensee acquired], if this court dismissed the action, [the licensee] could simply reinstitute the lawsuit."  Id. at 637.

In the present case, MEC and Covanta were precluded from bringing a fraudulent conveyance action against Slater Entertainment when they made the February 11, 2005 assignment because their right to file such an action expired on December 16, 2004.  Thus, the

22

February 11, 2005 assignment to Scher of any and all claims that MEC and Covanta had against

Slater Entertainment did not include a claim for fraudulent conveyance.  As such,  Ciba-Geigy

does not apply.  Scher also cites P&G v. Paragon Trade Brands, 917 F. Supp. 305 (D. Del. 1995)

but that case is similarly distinguishable from the present case.

For the above reasons, Scher lacked standing to assert this claim when he filed his

complaint and his claim was time-barred when MEC and Covanta eventually assigned Scher

their rights to whatever claims they had against Slater Entertainment.  Thus, Slater

Entertainment's motion for summary judgment will be granted as to Count 5.

**Counts 1, 2, 3 and 4 – fraudulent transfer in violation of the New York Debtor and**
**Creditor Law and the New Jersey Uniform Fraudulent Conveyance Act**

Scher argues that he has independent standing to assert claims under the New York

Debtor and Creditor Law and the New Jersey Uniform Fraudulent Conveyance Act.  Those

statutes each provide a creditor with the right to have a fraudulent conveyance set aside in order

to satisfy his or her claim against a debtor.  10 N.Y. Dr. & Cr. § 278; N.J.S.A. § 25:2-29.  Scher

contends that he is a creditor of MEC because the August 10, 2001 settlement agreement he

entered into with MEC provided that he would receive 13.5% of the net proceeds from the MEC

asset sale and he never received any such payment.  Thus, he argues, he is considered a creditor

under the New York Debtor and Creditor Law and the New Jersey Uniform Fraudulent Transfer

Act and therefore, has independent standing to pursue an avoidance action even after the debtor

filed for bankruptcy.

However, pursuant to the 2005 Settlement Agreement, Scher, Covanta and MEC

exchanged a mutual release of all claims arising out of or relating to the disputes between them.

Scher received $345,000 and other consideration in settlement of his claims.  Upon signing that agreement Scher ceased to be a creditor of MEC and thus relinquished his right to pursue a fraudulent conveyance action under the New York and New Jersey statutes.

Scher argues that although he released his claims against Covanta and MEC, he specifically retained claims against Slater Entertainment.  Consequently, he contends, he did not lose his right as a creditor to bring a fraudulent conveyance action under the New York and New Jersey statutes.  Scher concedes that fraudulent conveyance claims are derivative; if the underlying debt is paid or released by settlement, the creditor no longer has an action to recover assets from the transferee.  However, he cites several cases, MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 932 (D.N.Y. 1995); Gibbons v. First Fid. Bank, N.A. (In re Princeton-New York Investors, Inc.), 255 B.R. 376, 385 (Bankr. D.N.J. 2000); Loblaw, Inc. v. Wylie, 375 N.Y.S. 2d 706, 710 (4th Dept. 1975),  for the proposition that where a settlement between a creditor and a debtor specifically reserves the rights to the creditor to pursue claims against the transferee of assets, the claims are not moot and the now former creditor retains standing.

But those cases are distinguishable from the present case in that Scher did not specifically retain any claims against Slater Entertainment in the 2005 Settlement Agreement.  Rather, he released his claims against Covanta and MEC and acquired whatever claims they may have had against Slater Entertainment.   He did not expressly retain whatever claims he may have had against Slater Entertainment with regard to the asset sale.

Moreover, in each of the above cases, the transferee was already named as a defendant in the case being settled and the settlement agreements merely settled as to other defendants and

specifically reserved claims against the non-settling defendants.  Such is not the case here where Slater Entertainment was not a named defendant in the adversary proceeding and Scher did not specifically reserve any claims in the 2005 Settlement Agreement.  As the 2005 Settlement Agreement satisfied the debt underlying Scher's fraudulent conveyance claim, he can no longer recover from Slater Entertainment, the transferee.

Finally, once a plan is confirmed, a party may bring an avoidance action only if it has been appointed by the court as a representative of the estate.  In re Sweetwater, 884 F.2d 1323, 1326-28 (10th Cir. 1989).  The court's approval is required to ensure that it is the bankruptcy estate, and not an individual creditor, that benefits from the recovery.  Id. at 1327.  As Scher was not appointed by the court to pursue an avoidance action, and as he is the only one who would benefit from recovery in this case, he lacks standing to pursue the present action.

Thus, Slater Entertainment's motion for summary judgment as to Counts 1, 2, 3 and 4 will be granted.

## IV.  CONCLUSION

For the reasons set forth above, Scher's motion to disqualify will be denied and Slater Entertainment's motion for summary judgment will be granted and Scher's complaint will be dismissed with prejudice.

/s/ Dickinson R. Debevoise

DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:        June 26, 2006